**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
Washington, DC 20580

          Plaintiff,

       v.

SEVEN & I HOLDINGS CO., LTD.
8-8 Nibancho, Chiyoda-Ku
Tokyo, Japan 102-8452, and

7-ELEVEN, INC.
3200 Hackberry Road
Irving, Texas 75063

          Defendants.

Civil Action No.   23-cv-03600

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

**COMPLAINT FOR CIVIL PENALTIES AND
OTHER EQUITABLE RELIEF FOR
VIOLATION OF A FEDERAL TRADE COMMISSION DECISION AND ORDER**

Plaintiff Federal Trade Commission ("Commission") alleges as follows:

1. This case involves a blatant and undisputed violation of a Commission order by a serial acquirer whose deals the Commission has investigated and found to violate the antitrust laws. In 2018, Defendants Seven & i Holdings, Co., Ltd., and 7-Eleven, Inc. (collectively, "7-Eleven") proposed to acquire approximately 1,100 retail fuel outlets with attached convenience stores from Sunoco LP. The Commission investigated the proposed acquisition and determined that it violated the federal antitrust laws. If consummated, the transaction would have harmed

competition among retail fuel outlets by creating highly concentrated markets in 76 local markets—threatening to raise fuel prices, among other consumer harms.  Indeed, in 18 markets, the transaction would have created a monopoly, and in 39 markets, the transaction would have reduced the number of competitors from three to two.  7-Eleven agreed to resolve the Commission's investigation by negotiating and agreeing to a Consent Order that the Commission issued in March 2018.  Exhibit A.[1]

2.      The Consent Order required 7-Eleven to divest fuel outlets (or Sunoco LP to retain fuel outlets) in each of the 76 local markets, thereby remedying the immediate competitive harm threatened by the transaction.  Exhibit B ¶ II.[2]  In addition, the Consent Order prohibits 7-Eleven from acquiring specific third-party fuel outlets competing in the local markets without providing prior notice to the Commission.  Exhibit B ¶ VII.B.  The prior notice requirement is an essential element of the Consent Order.  Prior notice provides the Commission a fair opportunity to identify, investigate, and prevent future anticompetitive acquisitions by 7-Eleven *before* they occur and inflict irreparable harm on the public.  Without prior notice, 7-Eleven could quietly acquire retail fuel outlets in those concentrated markets and allow unlawful transactions to proceed without objection.  Prior notice is especially important given 7-Eleven's history of engaging in anticompetitive acquisitions.  Since 2018 alone, 7-Eleven has proposed two acquisitions, involving thousands of fuel outlets, that the Commission found to have violated the antitrust laws.

---

[1] The relevant portion of the Agreement Containing Consent Orders is attached to this Complaint as Exhibit A.
[2] The relevant public portion of the Consent Order is attached to this Complaint as Exhibit B.

3. Although the Consent Order expressly requires 7-Eleven to provide the Commission prior notice of certain future acquisitions, 7-Eleven violated its obligation.

4. In ▌ mere months after 7-Eleven signed the Consent Order—7-Eleven employees ▌ a competing fuel outlet in St. Petersburg, Florida (the "St. Petersburg Outlet"). The St. Petersburg Outlet was listed in the Consent Order as an outlet that 7-Eleven could not acquire without providing prior notice to the Commission.

5. 7-Eleven's acquisition of the St. Petersburg Outlet was plainly anticompetitive: 7-Eleven noted one deal rationale was ▌ and a 7-Eleven employee observed that, ▌ ▌ Tellingly, by not providing the Commission with prior notice, 7-Eleven deprived the Commission of its opportunity to investigate and seek to prevent this anticompetitive acquisition as the Consent Order requires. Instead, 7-Eleven completed the acquisition in ▌, eviscerating the remedy that the Commission had required in the Consent Order to maintain competition in that local market.

6. 7-Eleven reaped ▌ of dollars from violating the Consent Order. First, 7-Eleven benefited from likely being able to charge higher fuel prices at its other two locations near the St. Petersburg Outlet, one of which was right across the street. Second, over the period 7-Eleven operated the St. Petersburg Outlet, the company earned, by its own numbers, ▌ in EBITDA from retail sales. Third, when 7-Eleven ultimately sold the St. Petersburg outlet, it generated another approximately ▌ in capital gains from the sale. All told, these gains to 7-Eleven from violating the Consent Order are close to ▌, if not more.

3

7. Moreover, 7-Eleven's failure to implement meaningful internal controls meant that 7-Eleven's acquisition of the St. Petersburg Outlet went undetected, and thus unreported, for over three years. Indeed, from ███████████████████████, 7-Eleven made regular reports to the Commission that falsely certified that ████████████████████████████████████████. It was not until ███████—over three and a half years later—that 7-Eleven finally told the Commission that ████████████████████████████. Its acquisition is unlawful and in violation of the Consent Order.

8. 7-Eleven's conduct presents a model case for civil penalties. The Consent Order prohibits 7-Eleven from acquiring specific competitor outlets without providing prior notice to the Commission. The Consent Order is designed to protect consumers from anticompetitive acquisitions, which could lead to higher retail fuel prices, among other consumer harms. 7-Eleven—a serial acquirer of retail fuel outlets across the United States—violated the Consent Order, thereby harming consumers and generating ██████ in gains from an acquisition that it should never have made. This Court should award civil penalties for 7-Eleven's violation of the Consent Order to protect the public interest and deter 7-Eleven and others from flouting future consent orders.

**JURISDICTION AND VENUE**

9. This Court has jurisdiction over Seven & i Holdings Co., Ltd. and 7-Eleven, Inc. and over the subject matter of this action pursuant to Section 5(*l*) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(*l*) and 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355.

10.     Venue is proper in this District under 28 U.S.C. § 1391(b) and (c) and 28 U.S.C. § 1395(a).

## THE PARTIES

11.     Plaintiff Federal Trade Commission is an independent administrative agency of the United States government, established, organized, and existing pursuant to the FTC Act, 15 U.S.C. § 41, *et seq.*, with its principal offices in Washington, DC.  The Commission is authorized pursuant to Sections 5(*l*) and 16(a)(1) of the FTC Act, 15 U.S.C. §§ 45(*l*) and 56(a)(1), as amended, to initiate court proceedings to enforce its orders.

12.     Defendant Seven & i Holdings Co., Ltd. is a corporation organized, existing, and doing business under and by virtue of the laws of Japan, with its headquarters and principal place of business located at 8-8 Nibancho, Chiyoda-Ku, Tokyo, Japan 102-8452.

13.     Defendant 7-Eleven, Inc. is a corporation organized, existing, and doing business under and by virtue of the laws of the state of Texas, with its headquarters and principal place of business located at 3200 Hackberry Road, Irving, Texas 75063.  7-Eleven, Inc. is a wholly owned subsidiary of Seven & i Holdings Co., Ltd.

14.     Each Defendant, either directly or through its subsidiaries, is, and at all relevant times has been, engaged in commerce, as "commerce" is defined in Section 1 of the Clayton Act as amended, 15 U.S.C. § 12, and Section 4 of the FTC Act, as amended, 15 U.S.C. § 44.

## 7-ELEVEN'S ANTICOMPETITIVE ACQUISITION OF SUNOCO LP OUTLETS

15.     In 2018, the Commission alleged in an administrative complaint that 7-Eleven's proposed $3.3 billion acquisition from Sunoco LP of approximately 1,100 retail fuel outlets with attached convenience stores, if consummated, may have substantially lessened competition or

tended to create a monopoly in the retail sale of gasoline and diesel in 76 local markets across 20 metropolitan statistical areas, in violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Section 5 of the FTC Act, as amended, 15 U.S.C. § 45.  One of the local markets was in the Tampa metropolitan statistical area, which includes St. Petersburg, Florida.

16. If consummated, 7-Eleven's planned acquisition of certain Sunoco LP outlets would have harmed competition for retail gas and diesel fuel in those 76 local markets. Specifically, the complaint alleged that the acquisition would create a monopoly in 18 local markets.  In 39 local markets, the acquisition would have reduced the number of independent market participants from three to two.  In 19 local markets, the acquisition would have reduced the number of independent market participants from four to three.  These reductions in competition would have harmed consumers, who ultimately likely would have ended up paying higher fuel prices.

## THE COMMISSION CONSENT ORDER

17. To prevent those anticompetitive harms, the Commission required, and 7-Eleven agreed to be bound by, the Consent Order, which set forth several obligations designed to remedy the Commission's concerns.  Among other things, the Consent Order required 7-Eleven to divest fuel outlets in several local markets and prohibited 7-Eleven from acquiring fuel outlets in other local markets, where 7-Eleven already had a significant market share.

18. The Consent Order also requires 7-Eleven to provide the Commission notice before acquiring any interest in specific third-party retail fuel outlets located in those local markets for a period of ten years.  The Commission's prior notice requirement is a critical tool for protecting the American public and preventing future law violations.  Without prior notice, 7-

Eleven could pursue acquisitions of retail fuel outlets in these local markets without oversight because the acquisitions likely would fall below the Hart-Scott-Rodino Act premerger notification filing thresholds—thresholds designed to allow federal antitrust enforcers to review certain mergers before they are consummated.[3]  7-Eleven has sought to acquire nearly 5,000 retail fuel outlets since 2018 (roughly doubling 7-Eleven's total number of retail fuel outlets), spending $24 billion on two significant acquisitions, both of which were found by the Commission to violate the federal antitrust laws.  Given 7-Eleven's history as a repeat offender, the Consent Order was designed to ensure that the Commission would receive prior notice of any proposed 7-Eleven acquisition of a covered outlet and give the Commission an opportunity to evaluate and (if necessary) seek to block the proposed acquisition.  Thus, the prior notice provision serves as an important deterrent against anticompetitive acquisitions by a company, like 7-Eleven, that engages in serial acquisitions that violate the antitrust laws.

19.     Specifically, Paragraph VII of the Consent Order requires that for ten years, 7-Eleven shall provide the Commission with notice before acquiring any interest in any of the retail fuel outlets identified in a non-public schedule to the Consent Order.  Exhibit B ¶ VII.B.  That schedule lists, by address and Oil Price Information Service ("OPIS") number, the third-party retail fuel outlets for which 7-Eleven is required to give prior notice.  ███████████ ███████████████████████████████████████████████████████████ ████████████████

---

[3] The Hart-Scott-Rodino Act requires parties to certain mergers or acquisitions (for example, transactions above a certain value) to notify the Commission and Department of Justice before consummating the proposed transaction.  The parties must wait a specific period of time while the enforcement agencies review the proposed transaction.  The premerger notification provisions are codified at 15 U.S.C. § 18a.

20. Paragraph VII of the Consent Order specifies how 7-Eleven must provide prior notice to the Commission. Exhibit B ¶ VII.2. The Consent Order requires 7-Eleven to include (1) the information that the HSR Notification and Report Form requires and (2) maps identifying all retail fuel locations within five driving miles of the outlet that 7-Eleven intends to acquire. Exhibit B ¶ VII.B.1.(a)-(b). Paragraph VII of the Consent Order also requires 7-Eleven to identify, for each retail fuel outlet it owns that is within five driving miles of the outlet it intends to acquire, the other retail fuel outlets that 7-Eleven has monitored over the past year. Exhibit B ¶ VII.B.1.(c). In this context, "monitoring" means retail fuel outlets whose fuel prices 7-Eleven has reviewed. For each retail fuel outlet identified, 7-Eleven is required to provide its pricing strategy in relation to the monitored outlet. Exhibit B ¶ VII.B.1.(d). Collectively, this information is intended to allow the Commission to quickly determine whether the proposed acquisition may be anticompetitive and, if so, to seek additional information and to prevent the acquisition.

21. 7-Eleven is required to provide prior notice 30 days before consummating the acquisition of any of the retail fuel outlets identified in the non-public schedule to the Consent Order. Exhibit B ¶ VII.B.2. The Commission may then request additional information, and 7-Eleven would be prohibited from closing the acquisition until 30 days after it complied with the Commission's request. *Id.*

### 7-ELEVEN'S VIOLATION OF THE COMMISSION CONSENT ORDER

22. 7-Eleven does not dispute that it violated the prior notice requirement of the Consent Order.

23. Paragraph VII of the Consent Order requires prior notice before acquiring "any **leasehold**, ownership interest, or any other interest" (emphasis added) in the specific, identified outlets, including the St. Petersburg Outlet. Exhibit B ¶ VII.B.

24. In ▮▮▮▮—mere months after 7-Eleven agreed to the Consent Order—7-Eleven ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ One goal of the acquisition was to raise retail gasoline prices by ▮▮▮▮▮▮▮▮ As a 7-Eleven employee observed, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮—which explicitly required 7-Eleven to give the Commission prior notice before acquiring any "leasehold[s]"—▮▮▮▮▮▮▮▮▮▮▮▮. The acquisition enabled 7-Eleven to expand its presence with a larger store on the corner, eliminate a competitor, capture additional fuel sales at its outlets that previously would have gone to a competitor, and likely charge higher prices.

25. 7-Eleven failed to give the Commission prior notice of its acquisition of the St. Petersburg Outlet because 7-Eleven's internal controls (such as they were) for ensuring compliance with the Consent Order were wholly inadequate. 7-Eleven failed to implement any meaningful systems to ensure compliance with the Consent Order. Instead, 7-Eleven's compliance process consisted ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████, long after 7-Eleven had unlawfully acquired the St. Petersburg Outlet.

26.     At the time 7-Eleven acquired the St. Petersburg Outlet, it was filing 30-day interim reports to the Commission.  The reports informed the Commission, falsely, that ██████ ████████████████████████████████████.  These misstatements, repeated every 30 days for most of ████, make it clear that the violation did not simply stem from a failure to inform 7-Eleven employees of the Consent Order.  Instead, 7-Eleven management failed to properly monitor or report to the Commission acquisitions that were made in markets covered by the Consent Order.  7-Eleven filed multiple 30-day reports when it was █████████ ████████████████████████████████████████████████████████████.  In those reports, ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████.

27.     As it turned out, this certification was false beginning at least in ██████ ████████████████████████████████████████████████████████████████ ██████████████████████████.  During this time, 7-Eleven submitted eight false interim reports to the Commission.

28.     After acquiring the St. Petersburg Outlet, 7-Eleven tore it down, rebuilt it, and began operations at the site in May 2020.

29. On ▮▮▮▮▮▮▮▮—over three years after 7-Eleven acquired the St. Petersburg Outlet—7-Eleven ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. 7-Eleven then submitted an annual compliance report, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

30. Finally, on ▮▮▮▮▮▮▮▮, in response to its violation of the Consent Order and at the Commission's urging, 7-Eleven sold the St. Petersburg Outlet to a third party. Selling the St. Petersburg Outlet four years after the fact, however, does not moot 7-Eleven's violation of the Consent Order.

31. 7-Eleven deprived the Commission of its right to investigate and seek to block the unlawful acquisition pre-consummation because 7-Eleven did not provide the Commission prior notice as the Consent Order requires. In fact, 7-Eleven failed to give the Commission *any* notice for over three years. Nor did 7-Eleven give the Commission any of the information related to the required notice—no maps, no information on the competitive dynamics, and no pricing strategy information. With no warning, 7-Eleven unilaterally acquired a retail fuel outlet in St. Petersburg and violated the Consent Order.

## 7-ELEVEN'S VIOLATION OF THE CONSENT ORDER MERITS A MEANINGFUL CIVIL PENALTY

32. Relevant factors for determining the civil penalty amount for violating a consent order include: (1) harm to the public; (2) benefit to the violator; (3) good or bad faith of the violator; (4) the violator's ability to pay; (5) deterrence of future violations by this violator and others; and (6) vindication of the Commission's authority. Each factor merits a meaningful civil penalty in this case.

33. **The Violation Harmed the Public.** 7-Eleven's violation of the Consent Order harmed the public in at least two ways. First, 7-Eleven harmed consumers of fuel in the local

11

market in which the St. Petersburg Outlet competed when it unlawfully eliminated the St. Petersburg Outlet as a competitor. This elimination of competition likely allowed 7-Eleven to charge higher fuel prices to consumers during the period that 7-Eleven controlled the St. Petersburg Outlet. Second, 7-Eleven harmed the public at large by undermining the integrity of the government's ability to execute and enforce agreements whose purpose is to enforce the antitrust laws and protect competition.

34. **The Violation Benefitted 7-Eleven.** By unlawfully acquiring the St. Petersburg Outlet, 7-Eleven removed a competitor from the market to the benefit of its other locations in that market. This reduction in competition likely allowed 7-Eleven to generate additional profits from higher fuel prices. Moreover, on information and belief, 7-Eleven also reaped approximately ▮▮▮▮▮▮▮▮ in EBITDA from operating the St. Petersburg Outlet and another ▮▮▮▮▮▮▮▮ in capital gains from divesting it. In total, these gains to 7-Eleven from violating the Consent Order are close to ▮▮▮▮▮▮▮▮, if not more.

35. **7-Eleven's Conduct Reflects Bad Faith.** 7-Eleven's disregard of the prior notice requirements in the Consent Order reflects bad faith. 7-Eleven showed indifference towards the Consent Order's injunctions and failed to implement any semblance of corporate controls to ensure compliance with the prior notice provision. 7-Eleven's failings call into question how seriously 7-Eleven ever took its obligations to comply with the Commission's Consent Order. Although the Consent Order included express injunctions against acquiring specific outlets without giving the Commission prior notice, on information and belief, 7-Eleven failed to (1) inform all its employees responsible for leasing or acquiring new outlets about the obligations under the Consent Order and (2) ensure that proposed acquisitions were checked against the

Consent Order's list of outlets for which prior notice was required.  7-Eleven also filed eight compliance reports with the Commission that falsely represented ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ *See supra* ¶ 27.

36.     **7-Eleven Has the Ability to Pay.**  On information and belief, Seven & i Holdings Co., Ltd. had total revenues of approximately $80 billion in 2022 with U.S. operating income amounting to approximately $2.7 billion.  7-Eleven, therefore, has more than adequate ability to pay a significant civil penalty, and there is no basis for reducing the civil penalty to account for any financial difficulties.

37.     **A Meaningful Penalty Is Required to Deter 7-Eleven and Others.**  A meaningful civil penalty is required to deter not just 7-Eleven but also to deter other parties to Commission consent orders from violating such orders in a similar manner.  7-Eleven is a serial acquirer of retail fuel outlets across the United States.  The Commission has, on two occasions, found that 7-Eleven's proposed acquisitions would violate the antitrust laws.  The Commission has previously determined that these law violations could be resolved by entering into consent orders with 7-Eleven.  7-Eleven should not be allowed to profit from violating the Consent Order, and any civil penalty should far exceed the ill-gotten gains that it reaped by violating the Consent Order.  A meaningful civil penalty against 7-Eleven will incentivize it—and other parties to Commission consent orders—to invest in systems and controls for ensuring that Commission orders are followed.

38.     **A Meaningful Penalty Is Necessary to Vindicate the Commission's Authority.**  In 2018, the Commission determined that 7-Eleven's acquisition of Sunoco LP retail fuel outlets would, if consummated, violate Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and

13

Section 5 of the FTC Act, as amended, 15 U.S.C., § 45.  To remedy the violation charged, the Commission negotiated and executed the Consent Order with 7-Eleven.  7-Eleven agreed to abide by the Consent Order and to provide prior notice to the Commission.  The Commission's authority to execute binding consent orders is an important tool for enforcing the antitrust laws.  A significant civil penalty is required to vindicate that authority.

## COUNT ONE

### (Violation of the Consent Order)

39. Plaintiff realleges and incorporates by reference paragraphs 1 to 38 above.

40. 7-Eleven violated Paragraph VII of the Consent Order when it acquired the St. Petersburg Outlet on ▮▮▮▮▮▮▮▮▮▮, without notifying the Commission and providing the required information relating to such notice.  7-Eleven continuously violated the Consent Order from ▮▮▮▮▮▮▮▮▮▮, until it divested the St. Petersburg Outlet on ▮▮▮▮▮▮▮▮▮▮.

## CALCULATION OF CIVIL PENALTIES

41. Under Section 5(*l*) of the FTC Act and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, § 701 (further amending the Federal Civil Penalties Inflation Adjustment Act of 1990), violations of final Commission orders subject respondents to a potential civil penalty of up to $50,120 for each violation. *See also* 88 Fed. Reg. 1499 (January 11, 2023).  For continuing violations, each day is a separate violation.

42. 7-Eleven acquired the St. Petersburg Outlet on ▮▮▮▮▮▮▮▮▮▮, and sold the site on ▮▮▮▮▮▮▮▮▮▮.  That is 1,547 days.  Because each of the 1,547 days is a separate violation, the maximum civil penalty for 7-Eleven's failure to provide prior notice is $77,535,640.

14

## **REQUESTED RELIEF**

WHEREFORE, the Commission requests:

    a.    That the Court adjudge and decree that 7-Eleven's acquisition of the St. Petersburg Outlet was a violation of the Commission's Consent Order; and that Defendants were in violation of the Consent Order each day from ▮▮▮▮▮▮▮▮▮ to ▮▮▮▮▮▮▮;

    b.    That the Court order Defendants to pay an appropriate civil penalty amount;

    c.    That the Court order appropriate injunctive relief;

    d.    That the Court order such other and further relief as it may deem just and proper; and

    e.    That the Court award the Commission its costs of this suit.

| | |
|---|---|
| Dated: | Respectfully submitted, |
| December 4, 2023 | |
| |  */s/ James H. Weingarten*  |
| HENRY LIU (D.C. Bar 986296)<br>Director<br>Bureau of Competition | JAMES H. WEINGARTEN (D.C. Bar 985070)<br>Deputy Chief Trial Counsel<br>Federal Trade Commission<br>Bureau of Competition<br>600 Pennsylvania Ave, NW |
| RAHUL RAO<br>Deputy Director<br>Bureau of Competition | Washington, DC 20580<br>202-326-3570<br>jweingarten@ftc.gov |
| | MARIBETH PETRIZZI (D.C. Bar 435204)<br>Assistant Director |
| | ERIC D. ROHLCK (D.C. Bar 419660)<br>Deputy Assistant Director |
| | ANGELIKE A. MINA<br>SEBASTIAN LORIGO<br>CHRISTINE TASSO (D.C. Bar 985499)<br>Attorneys |
| | Bureau of Competition |
| | *Attorneys for Plaintiff Federal Trade Commission* |